# Exhibit A

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 10

FILED
8/12/2025 12:21 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH08291
Calendar, 10
33976708

FILED DATE: 8/12/2025 12:21 PM   2025CH08291

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

**Summons - Alias Summons** (03/15/21) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

JAMES HIGUERA, individually, and on
behalf of all others similarly situated,

Plaintiff(s)

v.

DAILYPAY, INC., and
DAILYPAY, LLC

Case No. 2025CH08291

Defendant(s)

Corporation Service Company
80 State Street, Albany, NY 12207

Address of Defendant(s)

Please serve as follows (check one):  ○ Certified Mail   ● Sheriff Service   ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court,
within 30 days after service of this summons, not counting the day of service. If you fail to do so, a
judgment by default may be entered against you for the relief asked in the complaint.

### THERE IS A FEE TO FILE YOUR APPEARANCE.

**FILING AN APPEARANCE:** **Your appearance date is NOT a court date.** It is the deadline
for filing your appearance/answer. To file your appearance/answer **YOU DO NOT NEED
TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/
answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/
approved/procedures/appearance.asp. After completing and saving your Appearance form, you can
electronically file (e-File) it with the circuit clerk's office.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Page 1 of 3

**Summons - Alias Summons**                                                    (03/15/21) CCG 0001 B

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office. You can also call or email the clerk's office to request your next court date. You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant. For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www. cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

⦿ Atty. No.: 99806                             Witness date _____
○ Pro Se 99500
                                               8/12/2025 12:21 PM Mariyana T. Spyropoulos
Name: Courtney R. Brown | Carney Bates & Pulliam    _____
Atty. for (if applicable):                     Mariyana T. Spyropoulos, Clerk of Court

Plaintiff                                      ☐ Service by Certified Mail: _____
_____
Address: One Allied Drive, Suite 1400          ☐ Date of Service: _____
                                                  (To be inserted by officer on copy left with employer or other person)
City: Little Rock

State: AR   Zip: 72202

Telephone: 501-312-8500

Primary Email: cbrown@cbplaw.com

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 8/12/2025 12:21 PM   2025CH08291

FILED DATE: 8/12/2025 12:21 PM  2025CH08291

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date.  Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:**  CivCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:**  CntyCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:**  DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:**  DVCourtDate@cookcountycourt.com
Gen. Info:    (312) 325-9500

### LAW DIVISION
**Court date EMAIL:**  LawCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:**  ProbCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:    (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:    (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:    (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:    (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:    (708) 232-4551

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED
9/3/2023 3:27 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH08291
Calendar, 10
33941468

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

**12-Person Jury**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| JAMES HIGUERA, individually, and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br><br>v.<br><br>DAILYPAY, INC., and DAILYPAY, LLC<br><br><br>Defendants. | CASE NO.: **2025CH08291**<br><br>**CLASS ACTION**<br>**DEMAND FOR JURY TRIAL**<br><br>Hearing Date: 10/10/2025 10:30 AM<br>Location: Court Room 2302<br>Judge: Moreland, Caroline Kate |

## CLASS ACTION COMPLAINT

Plaintiff James Higuera, ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief as to all other matters, and brings this Class Action Complaint against DailyPay, Inc., and DailyPay, LLC (together "Defendants" or "DailyPay"). DailyPay, Inc., and DailyPay, LLC, have coordinated to engage in the illegal practices in Illinois alleged herein.

### I.      BACKGROUND

1.      Illinois has long recognized the abuses of short-term payday lending and fought to protect consumers from high-interest lending practices. In 2005, the state of Illinois enacted the Payday Loan Reform Act ("PLRA") to curb abusive lending practices from predatory payday lenders. Despite the state's clear intention of rooting out abusive short-term high-cost lending practices, lenders found ways to circumvent the regulations with newly constructed forms of lending. As of December 2020, the average annual percentage rate ("APR") of a payday loan was 297%.

1

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

2.      Recognizing the need for more robust consumer protection, Illinois passed the Predatory Loan Prevention Act ("PLPA" or the "Act") in March 2021. Despite the PLPA's strict protections against usurious loans (including its 36% interest rate cap), DailyPay has offered its short-term, high-cost cash advance product to Illinois consumers for years. In violation of Illinois law, DailyPay has used this product to extract from Illinois consumers charges that yield APRs drastically exceeding the legal limit.

3.      This action centers on a phenomena observed by the Illinois Supreme Court more than 100 years ago:

> The form of the contract is not conclusive of the [usury] question. The desire of lenders to exact more than the law permits and the willingness of borrowers to concede whatever may be demanded to obtain temporary relief from financial embarrassment have resulted in a variety of shifts and cunning devices designed to evade the law. The character of a transaction is not to be judged by the mere verbal raiment in which the parties have clothed it, but by its true character as disclosed by the whole evidence. If, when so judged, it appears to be a loan or forbearance of money for a greater rate of interest than that allowed by law, the statute is violated and its penalties incurred, no matter what device the parties may have employed to conceal the real character of their dealings.

*See Clemens v. Crane* (1908), 234 Ill. 215, 229–30, 84 N.E. 884, 889; *accord Cooper v. Nock* (1862), 27 Ill. 301, 302 ("[I]n trials of questions of usury, it has ever been held that no device intended to cover up the real character of the transaction, can ever avail to defeat the statute.").

4.      DailyPay's product is merely the newest "shift[] and cunning device[] designed to evade the law." DailyPay's lending product—referred to herein as "Paycheck Advance" is an "earned wage access" or "earned wage advance" ("EWA") service—was created and offered to consumers to avoid regulation applicable to lenders and loan products. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

5.      EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds and associated fees are repaid directly from borrowers' payroll providers, eating into borrowers' wages on payday.

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

These EWA products are payday loans by another name and violate the PLPA.

6. This action challenges Defendants' technology-driven attempt to evade the prohibitions of PLPA. Defendants extend small-dollar advances, usually for less than $100, and charge fees between $1.99 and $3.99, with the resulting annual percentage rate (the yearly cost of borrowing money) matching loan-shark rates. In exchange, borrowers must agree to allow DailyPay to collect repayment of the advance, and associated fees, from their next paycheck. Borrowers assign all rights and title to their wages owed to DailyPay as collateral and are forced to agree to not interfere with repayment. That assigned collateral is secured by employers' obligations to pay, supported by extensive credit underwriting regarding employers' ability to make payroll. This amounts to secured payday lending in violation of Illinois law and policy.

7. This Complaint seeks to protect Illinois residents from DailyPay's predatory lending practices that violate the PLPA.

8. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendants' Paycheck Advance transactions constitute loans.

9. DailyPay's regular business practices systematically violate the PLPA with respect to Plaintiff and each member of the putative class to whom DailyPay has extended its usurious loans.

## II.   PARTIES

10. Plaintiff is an individual, over 18 years of age. At all relevant times, Plaintiff was a natural person and resident of Cook County, Illinois.

11. Defendant DailyPay, Inc., is a Delaware corporation with its principal place of business in New York, New York. Defendant has offered and entered into loan agreements

3

FILED DATE: 8/8/2025 3:27 PM 2025CH08291

with Illinois consumers, including Plaintiff, since at least 2015, entering into millions of credit transactions. Defendant DailyPay, Inc., has transacted such business using the name and holding itself out as "DailyPay."

12.     Defendant DailyPay, LLC, is a Delaware corporation with its principal place of business in New York, New York. Defendant DailyPay, LLC, has offered and entered into loan agreements with Illinois consumers, using the name and holding itself out as "DailyPay."

### III.     JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendants because Defendants are registered to do business in this state, regularly conducts substantial business in this State, has purposefully availed itself of the laws of Illinois for the specific transactions at issue, and because Plaintiff's claims arise out of Defendant's conduct within this State.

14.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-102(a) because Defendants conduct substantial business in Cook County and a substantial part of the conduct giving rise to Plaintiff's claims occurred in Cook County.

15.     At all times relevant herein, Defendants regularly conducted business in Illinois.

16.     At all relevant times, Defendants extended at least hundreds of thousands of usurious loans to borrowers in Illinois—including in Cook County—crediting and debiting bank accounts at Illinois banks belonging to Illinois borrowers with loan proceeds and payoffs for DailyPay users.

17.     At all relevant times, Defendants purposely and knowingly directed advertisements and marketed to consumers in Illinois for the purpose of entering and profiting from usurious and illegal loans with the consumers. In so doing, Defendants purposefully availed themselves of the privileges and benefits of conducting business in Illinois.

### IV.     LEGAL BACKGROUND

FILED DATE: 8/6/2025 3:27 PM    2025CH08291

A.     **The Illinois Predatory Loan Prevention Act**

18.     Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are frequently marketed as a quick solution for bridging financial gaps between paychecks.

19.     Before 2021, payday lenders operating in Illinois had developed artifices to avoid usury regulation and were charging triple-digit annual percentage rates (APRs)—often 300% or more—on small-dollar, short-term loans.

20.     Myriad studies showed that the vast majority of payday lending in Illinois was issued to repeat borrowers. The high fee, short-term nature of payday loans traps users in a cycle of debt, perpetuating the ever-growing need for additional borrowing and associated fees.

21.     Despite prior regulatory efforts, payday lending remained a significant source of economic harm and societal inequity for Illinois consumers, prompting legislative action to provide more robust protections. By the time the PLPA was enacted, the public and legislative consensus had grown that the payday lending model—high fees, short terms, repeat borrowing—was structurally predatory and disproportionately harmful to vulnerable people and communities.

22.     The Illinois Predatory Loan Prevention Act, signed into law in March 2021, represents a landmark reform aimed at eradicating predatory payday lending in the state.

23.     The PLPA establishes a clear 36% APR cap on all consumer loans, including payday, auto title, and installment loans.

24.     The PLPA is broad in scope and expressly prohibits evasion of its mandates. That is, the PLPA states, "No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to" "disguis[ing]" loans as non-loan transactions.

25.     Additionally, the PLPA contains a provision that expressly forbids a waiver of "any provision" of the Act.

26.     The PLPA was modeled after the Military Lending Act. Indeed, 815 ILCS 123/15-1-5 states the "purpose of th[e PLPA] is to protect consumers from predatory loans

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

consistent with federal law and the Military Lending Act[.]"

27.      A press release from the governor's office noted: "While the existing federal law [*i.e.*, the MLA] already protects active-duty military with a 36 percent APR cap, this legislation would extend the same protection to Illinois veterans and all other consumers."[1]

28.      The same press release emphasized "Illinois families pay over $500 million per year in payday and title loan fees, which is the fourth highest in the nation," and the PLPA would serve the righteous purpose of "provid[ing] families with more economic stability."

29.      The PLPA applies to "loans," which it defines broadly to mean "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions." 815 ILCS 123/15-1-10. The definition includes both closed-end and open-end credit agreements and "any transaction conducted via any medium whatsoever." *Id.*

30.      The PLPA delegated to the Illinois Department of Financial and Professional Regulation (the "DFPR") the authority to draft, adopt, and enforce administrative rules ensuring lenders comply with the Act.

31.      When the PLPA was enacted, the DFPR issued a press release noting the "PLPA covers many types of consumer loans, which include . . . ***wage advance products***" like DailyPay's Paycheck Advance product.[2]

32.      A violation of the PLPA "constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." 815 ILCS 123/15-10-5(b).

## V.   <u>FACTS</u>

### A.   <u>DailyPay's Paycheck Advance Product</u>

33.      DailyPay is an app-based lender that makes cash advances to employees whose employers have partnered with DailyPay to facilitate Paycheck Advances.

---

[1] *Gov. Pritzker Signs Equity-Centric Legislation Expanding Economic Access and Opportunity Across Illinois*, ILL. DEP'T OF FIN. & PROF. REG. (Mar. 23, 2021), https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/news/2021/2021-03-23-predatory-loan-prevention-and-cra.pdf.
[2] *See IDFPR Releases Consumer Frequently Asked Questions About the Predatory Loan Prevention Act*, Ill. Dep't Fin. & Prof. Reg'n (Apr. 30, 2021), attached hereto as Exhibit 1.

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

34.     DailyPay primarily lends to employees who earn hourly wages and are paid on fixed cycles (*i.e.*, every two weeks or monthly), promoting Paycheck Advances as providing access to "wages" that employees have "earned" during the pay period but not yet received.

35.     Some of the companies that have partnered with DailyPay to provide its Paycheck Advance program to employees include large fast food chains like Taco Bell and Wendy's and retailers like Kroger and Target, many of whom pay wages at or near minimum wage.

36.     DailyPay facilitates Paycheck Advances through a smartphone app-based platform that allows employees to obtain funds via electronic transfer from DailyPay directly to their bank accounts in amounts DailyPay determines to make available based on its analysis of payroll data.

37.     The fees charged to use DailyPay's product vary by employer and by the speed with which funds are made available. DailyPay uses the following dual fee structure: DailyPay (i) charges $0.00 to $1.99 for Paycheck Advances in which the borrower receives his cash disbursement within 1–3 business days; and (ii) charges up to $3.99 for Paycheck Advances in which the borrower receives cash disbursement immediately. For some employees, this means that a fee is mandatory whether the employee chooses a Paycheck Advance in which disbursement is immediate *or* occurs within 1–3 business days.

38.     DailyPay collects repayment of the Paycheck Advances it sends employees, along with all associated fees, by requiring employers to route employees' direct deposits to a bank account held by DailyPay. Once DailyPay deducts everything it claims it is owed by the employee, DailyPay deposits remaining amounts in employees' bank accounts.

> ### *i.     DailyPay Partners with Employers to Deliver and Market Paycheck Advances to Employees*

39.      DailyPay markets its Paycheck Advance program to potential new employers, promising its cash advance program "can help you recruit more employees, increase employee

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

engagement, and improve retention."

40.     DailyPay likewise touts its program is a "tremendous benefit[] to the employer – reduced turnover, increased employee productivity and engagement, and seamless integration across the tech stack – all for a price tag of $0 to the business."

41.     Employers who buy DailyPay's sales pitch and agree to make the Paycheck Advance program available to their employees enter into DailyPay's form Master Services Agreement ("MSA"). Under the form MSAs, the employer must agree to make DailyPay the exclusive provider of "on-demand pay solutions."

42.     Under the MSAs, participating employers agree to promote DailyPay's Paycheck Advance program to their employees, by *inter alia* identifying the program as "a benefit" offered by the employer, distributing marketing materials created by DailyPay, and taking steps to ensure that DailyPay's own advertising and communications sent by email do not get routed to employees' spam or junk email folders.

43.     For example, DailyPay's "Quickstart" guide encourages employers to display DailyPay "posters in break rooms" and hand out "FAQ cards to employees at the beginning of shifts or during team huddles." DailyPay provides other advertisements to employers promoting its Paycheck Advance products to employees, advertising its benefits, and encouraging employees to sign up.

44.     In its marketing materials directed to employees, DailyPay portrays its Paycheck Advance program as being free. For example, DailyPay directs employees to its "free app" and encourages them to "get started free today" so they can receive money "in the right place, at the right time!"

45.     DailyPay also markets the ability for employees to obtain immediate funds through its program. DailyPay's electronic ads, for example, contain links with the words: "Get paid today."

46.     Ads for Paycheck Advances to be posted in the workplace likewise declare:

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

"Access your pay when you need it!" One such poster includes a screenshot of the DailyPay app that identifies various amounts available for transfer but says nothing about any associated fees. The same poster also says: "Money in the right place, at the right time." Other advertisements directed at employees deliver a similar message, promoting the ability to access money "when you need it" and to "save the day."

47.     The combination of DailyPay's marketing of a cost-free program and the immediate availability of funds cultivates the misimpression that immediate advances are free. In promotional materials provided to employers to share with employee-borrowers, DailyPay touts the ability to "access your pay when you need it" and declares that employees can get started "for free." Several demonstrative advertisements are shown below:



*Figure 1*

9

FILED DATE: 8/8/2025 3:27 PM   2025CH08291



*Figure 2*



*Figure 3*

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

48.     In addition, new users are shown screens in the app highlighting the app's functionality allowing borrowers to "instantly" transfer funds to bank accounts, stressing the ability to "[a]ccess your money when you need it" without disclosing the associated costs.

### ii.     *DailyPay's High-Cost, Short-Term Paycheck Advances Yield Handsome Profits to DailyPay at the Expense of Borrowers*

49.     Under DailyPay's Paycheck Advance program, DailyPay attributes "Unpaid Earnings" to each employee user, defined as his right to payment for regular pay that will be owed but has not yet been paid.

50.     A user accessing the DailyPay app can also view his available balance, which constitutes a portion of his Unpaid Earnings that DailyPay, in its sole discretion, decides to make available to borrowers in the form of a Paycheck Advance.

51.     DailyPay explains the available balance on its website as follows:



*Figure 4*

11

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

52.     To be eligible for Paycheck Advances, employees consent to their employers sharing payroll data with DailyPay.

53.     Likewise, employers who have partnered with DailyPay agree in their MSAs to provide DailyPay "current, accurate" payroll data – including "gross earnings" and "net earnings" – for employee-borrowers on an ongoing basis.

54.     As stated above, the fees charged by DailyPay for Paycheck Advances vary based on employer and are generally (i) between $0.00 and $1.99 for advances issued between 1–3 days, and (ii) up to $3.99 for advances issued immediately.

55.     The fees charged by DailyPay to employees for Paycheck Advances grossly exceed the actual expense to make real-time payments. The actual cost to provide customers with instant access to funds is less than $0.05.[3]

56.     In its program terms, DailyPay differentiates between "Daily Earnings" (defined to mean an employee's requested Paycheck Advance, including fees) and "Amount Provided" (meaning the amount DailyPay sends the employee). For example, if an employee requests a $50 Paycheck Advance for a $2.99 fee, the Daily Earnings is $50 while the Amount Provided is $47.01 (the $50 principal less the $2.99 fee).

57.     When an employee requests a Paycheck Advance from DailyPay, she assigns "all right, title, and interest in and to the related Daily Earnings"—in essence, an assignment of the total amount of the Paycheck Advance and fee—to DailyPay. DailyPay thereby receives a "wage receivable" from the employee against the loan principal ($47.01 in the previous paragraph, plus a $ 2.99 loan fee).

58.     DailyPay's cash advance transactions, and fees received from consumers, have been the subject of recent regulatory scrutiny and action. DailyPay was recently sued by the

---

[3] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org//media/new/tch/-documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

State of New York for violating state usury law, *New York v. DailyPay, Inc.*, No. 154851-2025 (N.Y. Sup. Ct. Apr. 14, 2025) ("*New York Action*"). The State of New York attached to its pleading the report of a data expert who reviewed millions of cash advance transactions made by DailyPay to New York residents and found, *inter alia*:

- DailyPay approximately 9.8 million Paycheck Advances to more than 130,000 New Yorkers between October 2020 and December 31, 2024 (the observed period);

- The most common Paycheck Advance was between $25 and $50 with a $2.99 fee;

- DailyPay was paid a fee on approximately 90% of Paycheck Advance transactions;

- DailyPay's fee revenue grew dramatically during the observed period—from $3.35 million in the first eighteen months, up to $9 million in the last nine months.[4]

59.    In a presentation created by DailyPay for external use, DailyPay touts achieving annual recurring revenues exceeding $235 million and having more than 1.2 million active users, and that both recurring revenues and active users are growing at an accelerating rate.

60.    DailyPay's Paycheck Advances impose exorbitant costs of credit on its users. According to the Hasanov Report:

- the median loan duration is only eight days;

- the most common Paycheck Advance was for $20.00;

- the most common Paycheck Advance fee paid was $2.99;

- the median APR in observed Paycheck Advance transactions was 193.47%, and the average APR was 398.59%;

---

[4] *See generally* Ex. 1 to Compl. in *New York Action*, Expert Affidavit of Akram Hasanov (the "Hasanov Report"). Though Mr. Hasanov analyzed transactions issued to New York consumers, DailyPay's Paycheck Advance program offering is materially identical in both New York and Illinois.

13

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

61.     The Consumer Financial Protection Bureau made similar findings in an analysis of data from eight employer-partnered EWA providers. Specifically, the CFPB found:

- "both the number of employer-partnered earned wage product transactions and the total dollar amount of funds accessed nearly doubled" over a two-year period;

- "around 90% of workers paid at least one fee and approximately 82% of transactions incurred a fee" despite the presence of ostensibly fee-free options;

- "using average inputs from [the CFPB's] sample data, a single earned wage transaction of $106 with $3.18 in fees for a ten-day period . . . equates to an APR of 109.5%. As actual APRs will vary depending on transaction size, fees paid, and duration, a 109.5% APR *understates* APRs for smaller transactions with shorter terms. For example, a $50 transaction with $3.18 in fees for four days equates to a 480.4% APR. This kind of APR variance may explain why studies with access to transaction level data report higher average APRs."[5]

62.     As shown below, Plaintiff's short-term Paycheck Advance transactions from DailyPay carried similar usurious APRs.

### iii.     *DailyPay's high costs trap users in a debt cycle in which users become dependent on Paycheck Advances*

63.     To maximize its revenues and sustain growth, DailyPay needs employees to frequently obtain Paycheck Advances, and pay attendant fees.

64.     DailyPay's product is designed to grow users' need for more loans: when a borrower obtains a Paycheck Advance, the amount that he receives from his next pay cycle is reduced by the amount of the Paycheck Advance, plus fees. As a result, employee borrowers are more likely to need to obtain another Paycheck Advance (and to pay another fee) in their

---

[5] *Data Spotlight: Developments in the Paycheck Advance Market*, Consumer Fin. Prot. Bureau (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/ ("*Data Spotlight*").

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

next pay cycle to make up shortfalls that occur on payday.

65.     This creates a cycle of dependency in which the act of obtaining a Paycheck Advance creates a need, in the next pay cycle, for additional funds, thereby necessitating another Paycheck Advance. As the CFPB has explained, "Repeat usage is high and the share of workers using [Paycheck Advance] products each month is increasing."[6]

66.     The result is an increasingly dependent user base. DailyPay has acknowledged the importance of repeat use. In describing its annual revenue per-employee to investors, DailyPay notes that the average employee uses Paycheck Advances twice per week and generates $300.00 in revenue to DailyPay per year.

67.     Indeed, DailyPay expressly encourages repeat use. For example, when an employer's payroll records indicate additional hours worked, DailyPay sends notifications such as: "new earnings in your Daily Pay account!" and "your DailyPay balance just went up!" An exemplar push notification is reproduced below:



*Figure 6*

68.     DailyPay reinforces this messaging in advertisements telling employees they "deserve to be paid every day" and mocking employees that are "waiting 2 WEEKS for their paycheck???"

69.     Even its name—*DailyPay*—reinforces the notion that employees should receive "daily pay" and, of course, pay fees to obtain access to each advance.

70.     Through these efforts, in conjunction with the structure of the Paycheck Advance product and DailyPay's intentional targeting of employees living paycheck to

---

[6] *Data Spotlight*, *supra* note 5.

FILED DATE: 8/6/2025 3:27 PM  2025CH08291

paycheck, DailyPay is steadily growing its number of workers who are dependent on Paycheck Advances.

71.     The upshot of the repeat use DailyPay has fostered is a steady flow of fees for DailyPay's short-term, high-cost cash advances, from utterly dependent users. Once a worker starts taking multiple Paycheck Advances each pay period, she generally continues to do so, out of necessity. Indeed, DailyPay touts its 96% revenue retention rate and high and growing revenue per-consumer.

72.     But this business model—which relies on heavy users to drive revenue growth through transaction fees—comes at a cost to the workers who pay those fees as costs of credit. Because of the nature of the Paycheck Advance product, many users come to rely on the advances and need them every other day (or more) on average.

73.     Ironically, DailyPay and other industry participants market their products as a low-cost alternative to payday loans.[7] In truth, DailyPay is a wolf in sheep's clothing: extending loans with APRs similar to, and often exceeding, the exorbitantly-priced payday loan products it purports to replace.

74.     The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[8]

75.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

76.     A recent analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were

---

[7] According to a promotional document created by DailyPay: "DailyPay is a Payday Loan Killer and an Overdraft Eliminator." https://www.dailypay.com/wp-content/uploads/AITE-research-infographic.pdf (last visited May 22, 2025). The promotional document referenced in this footnote cites as support a flawed survey that DailyPay paid for and played a significant role in authoring.

[8] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[9] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

77.     Another study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[10]

> ### iv.     DailyPay ensures repayment through levels of underwriting, agreements with employer partners and users, and continually monitoring credit risk

78.      While DailyPay's Paycheck Advance product is financially disastrous for borrowers, it is no doubt a profitable enterprise for the lender. To ensure repayment and maximize profits, DailyPay uses exacting underwriting procedures and creates layers of protection to ensure its Paycheck Advances are repaid. The end result is a repayment rate approaching 100%.

79.     DailyPay leverages its real-time access to payroll data to determine the maximum Paycheck Advance that an employee may obtain to ensure the Paycheck Advance and fees on such transactions will be less than the paycheck routed to DailyPay on the borrower's next payday.

80.     DailyPay uses automated processes to adjust amounts available to lend for factors that could affect its ability to collect on its Paycheck Advances, such as "the impacts of any taxes, benefits, and garnishments for each unique employee."

---

[9] *Id.*
[10] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 6 (Apr. 2024).

17

FILED DATE: 8/6/2025 3:27 PM    2025CH08291

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

81.     And if an employer provides inaccurate payroll data that causes DailyPay to make Paycheck Advances exceeding an employee's total pay, under the MSAs, the employer is responsible to pay the shortfall.

82.     DailyPay receives legal protections for amounts it is owed. When an employee obtains a Paycheck Advance, he or she must assign to DailyPay the "right, title, and interest in and to" future wages in an amount equal to the Paycheck Advance plus any associated fees. In addition, the borrower simultaneously agrees that DailyPay "can stand in [his or her] shoes and receive payment for the Daily Earnings" from the employer.

83.     Upon enrollment in DailyPay's program, an employee must arrange for his employer to direct deposit his pay to an "account bearing the DailyPay Routing and Account Number" (i.e., a DailyPay bank account). To request an advance, the borrower must agree that he "will not take any action"—such as "redirecting payments, or placing or allowing placement of a lien or security interest on any DailyPay Earnings"—that has an "adverse effect on [DailyPay's] ability to collect on or retain any Daily Earnings."

84.     Likewise, employees promise to "take all actions, including the execution of documents requested by [DailyPay], to preserve and protect [its] right, title, and interest to any Daily Earnings." In that vein, if an employee is paid directly on a paycheck that included money purportedly owed to DailyPay, the employee is required under DailyPay's terms to "notify [DailyPay] immediately and hold the amount in trust for our benefit."

85.     For much of the class period, DailyPay included in its program terms the right to debit an employee's bank account directly to collect amounts owed but not repaid due to error, fraud, disputes, or breaches of DailyPay's agreements.

86.     Separately, DailyPay's standard MSAs with employers provide that the employer will make all payroll payments owed to employees that use the Paycheck Advance program directly to DailyPay. On payday, employers who partner with DailyPay deposit workers' entire pay in a DailyPay bank account, from which DailyPay collects all Paycheck

18

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

Advances and fees owed before passing any remaining amounts to the borrower.

87.     DailyPay guards against the risk of lending to unemployed persons by requiring its employer partners to "immediately deactivate" DailyPay user accounts when a user has been terminated by the employer.

88.     Since DailyPay collects repayment of loaned funds directly from employees' wages via employer payroll distributions, DailyPay's primary risk of loss on the loans it issues is that an employer will not make payroll.

89.     DailyPay guards against that risk by employing layers of underwriting of its employer partners to ensure DailyPay collects repayment of loaned funds. For instance, DailyPay reviews data analytics metrics for its employer partners created by Dun & Bradstreet, a professional services firm that assesses companies' viability and quantifies the risk that a company might go out of business or file for bankruptcy (and, importantly for DailyPay's purposes, potentially fail to meet payroll obligations).

90.     DailyPay accepts new employers only when Dun & Bradstreet's analyses reflect a low probability that the company will go under. In addition to the third-party analysis, DailyPay considers employers' credit rating, liquidity, revenues and profits, and balance sheet, among other factors.

91.     For existing employer partners, DailyPay continuously monitors their credit quality over time (by, *inter alia*, reviewing similar data as discussed above) to ensure repayment of loaned funds going forward. Under the MSAs, employers must regularly submit to DailyPay balance sheets, audited financial statements, and credit applications (the forms of which are created and controlled by DailyPay).

92.     Under the MSAs, employers are legally obligated to repay DailyPay for any Paycheck Advances issued under the program. Failure to make its contractually required payments may result in DailyPay taking legal action against the employer.

93.     Through these comprehensive credit underwriting measures, DailyPay collects

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

repayment on substantially all of the Paycheck Advances it issues. According to an analysis of DailyPay transactional data for New York, DailyPay collected between 99.92% and 99.99% of the loaned funds it issues.

**B.      DailyPay's Loans to Plaintiff**

94.      Plaintiff is, and has at all relevant times been, an Illinois resident.

95.      DailyPay extended loans to Plaintiff in the form of Paycheck Advance loan transactions like those discussed above.

96.      The loans to Plaintiff were not subject to any of exceptions to the PLPA.

97.      Plaintiff paid DailyPay interest in the form of transfer fees (including so-called "Instant Transfer" fees and "Next Business Day ACH Transfer" fees) to obtain Paycheck Advances from DailyPay.

98.      A small selection of Paycheck Advances made by DailyPay to Plaintiff (and accompanying transfer fees) are shown in the table below, with the cost of credit and APR included:

| Date | Principal Amt. | Transfer fees | Loan period | APR |
|------|----------------|---------------|-------------|-----|
| 5/2/24 – 5/8/24 | $22.74 | $2.99 | 6 days | 800% |
| 6/1/24 – 6/5/24 | $22.58 | $2.99 | 4 days | 1,208% |
| 3/30/25 – 4/3/25 | $63.50 | $3.49 | 4 days | 502% |
| 4/8/25 – 4/10/25 | $56.13 | $3.49 | 2 days | 1,135% |
| 4/26/25 – 5/1/25 | $64.79 | $3.49 | 5 days | 393% |

99.      Plaintiff has received dozens of usurious loans from DailyPay since he started using the service. For much of the relevant period, Plaintiff took out multiple loans each pay period and was forced to take out more loans immediately after repayment of his last.

100.      The cycle of lending, combined with DailyPay's expensive transfer fees, erodes Plaintiff's take-home pay each month creating a self-perpetuating cycle of loan dependence.

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

101.    The fees attendant to Defendants' loans are immediately and directly connected to DailyPay's extensions of credit to Plaintiff.

## VI.    CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure on behalf of himself and all other persons similarly situated and the general public. The proposed "Class" is defined as follows:

> All Illinois residents who entered into an agreement with DailyPay to use its earned wage advance (or substantially similar) product, in which DailyPay was paid a finance charge (including, without limitation, a transfer fee).

103.    Expressly excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) DailyPay and any entity in which DailyPay has a controlling interest, or which has a controlling interest in DailyPay, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

104.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

105.    Plaintiff is unable to state the precise number of members of the class because such information is in the exclusive control of DailyPay. DailyPay's scheme has harmed and continues to harm the members of the Class. Plaintiff believes that there are over 1,000 members of the proposed Class. The members of the proposed Class are so numerous that joinder of all members is impracticable. DailyPay has made at least hundreds of thousands of loans, and Plaintiff estimates there are at least many thousands of consumers in the Class. As a result, members of the Class are so numerous that joinder of all class members is impracticable. The exact size of the proposed class, and the identity of the members thereof,

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

will be readily ascertainable from the business records of DailyPay.

106.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in DailyPay's possession, custody, or control.

107.    **Commonality.** There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that DailyPay has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Plaintiff and Class members are subject to the protections and limitations of the PLPA;

- Whether DailyPay is a "lender" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

- Whether DailyPay issued "loans" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

- Whether DailyPay's loans to members of the Class exceed the 36% interest rate cap set by 815 ILCS 123/15-5-5;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether DailyPay is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiff and the Class are entitled under 815 ILCS 505/10a; and

- Any declaratory and/or injunctive relief to which the Class is entitled.

108.    **Typicality.** The claims and defenses of Plaintiff are typical of the claims and defenses of the Class because Plaintiff is an Illinois resident and his loan agreements with DailyPay are typical of the type of payday loans that DailyPay normally provides to Illinois residents. Additionally, DailyPay uses the same or substantially similar standard form loan

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

agreements in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Plaintiff suffered damages of the same type and in the same manner as the Class he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Class.

109.    **Adequacy.** Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class, and Plaintiff has no conflict of interest that will interfere with maintenance of this class action.

110.    Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

111.    **Predominance and Superiority.** The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Class is so numerous as to make joinder impracticable. However, the Class is not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

23

FILED DATE: 8/6/2025 3:27 PM   2025CH08291

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

112.    The proposed Class fulfills the certification criteria of the Illinois Code of Civil Procedure.

### COUNT I
### Violations of the Illinois Predatory Loan Prevention Act

113.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–112 above.

114.    Plaintiff brings this claim individually and on behalf of the Class.

115.    DailyPay is a lender, meaning DailyPay offers or makes loans to Illinois residents.

116.    DailyPay issued loans to Plaintiff and other Illinois residents. That is, DailyPay provided money or credit to Plaintiff and class members in exchange for the consumers' agreement to a certain set of terms, including, but not limited to, finance charges, interest, or other conditions.

117.    Plaintiff and the Class are borrowers residing in Illinois who obtained cash-advance loans from DailyPay and paid interest and other charges in connection with those loans.

118.    DailyPay's fee charges constitute finance charges for purposes of calculating the applicable APR under the PLPA.

119.    DailyPay's loans to Plaintiff and the Class exceed the 36% rate cap set by the PLPA.

120.    The PLPA renders loans made in excess of the 36% APR cap null and void and provides that the consumer is not obligated to repay any amounts paid or owed on such loans. 815 ILCS 123/15-5-10.

121.    Plaintiff and members of the Class have paid unlawful fees and finance charges in connection with DailyPay's loans and are entitled to relief under the PLPA.

24

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

122.    DailyPay's violations of the PLPA "constitute[ ] violation[s] of the Consumer Fraud and Deceptive Business Practices Act" ("CFDBPA").

123.    WHEREFORE, Plaintiff prays for relief as set forth below.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Class, Plaintiff prays for judgment against Defendants as follows:

a.    That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b.    That the Court enter judgment against DailyPay and in favor of Plaintiff and the Class on all counts;

c.    An order awarding the members of the Class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

d.    An order providing Plaintiff and the members of the Class restitution for any principal, interest, fees, or other charges paid to Defendants;

e.    An order declaring the cash advances that Plaintiff and the Class members obtained were or are void ab initio;

f.    An order preventing Defendants from attempting to collect their cash advances from Plaintiff and the Class members;

g.    That the Court enjoin DailyPay from continuing to engage in predatory payday lending practices in violation of the PLPA;

h.    That DailyPay be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that DailyPay be ordered

25

FILED DATE: 8/8/2025 3:27 PM   2025CH08291

to bear the cost of notice to the absent class members, as well as the administration of any common fund;

i.  That the Court award interest as allowable by law;

j.  That the Court award all costs of suit; and

k.  That the Court award such other and further relief as the Court may deem just and proper.

Dated: August 8, 2025     Respectfully submitted,

<div style="margin-left:40%;">

*/s/ Courtney Ross Brown*
Courtney Ross Brown (6340021)
cbrown@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Ste. 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiff James Higuera*
*and the Proposed Class*

</div>

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 10

FILED
8/11/2025 4:26 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH08291
Calendar, 10
33964591

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION

JAMES HIGUERA, on behalf of himself and
the proposed class,

       *Plaintiff,*

            v.

DAILYPAY, INC., and
DAILYPAY, LLC

       *Defendants,*

Case No. 2025CH08291

Hon. Caroline Kate Moreland

Calendar 10

## MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT

Plaintiff James Higuera, through counsel, moves this Court for an order certifying this case

as a class action under Illinois Code of Civil Procedure Section 2-801. Plaintiff requests that the

Court enter and continue the motion until after discovery relating to class certification, at which

time Plaintiff will submit a more detailed supporting memorandum of points and authorities.[1]

## INTRODUCTION

Illinois has long recognized the abuses of short-term payday lending and fought to protect

consumers from high-interest lending practices. In 2005, the state of Illinois enacted the Payday

Loan Reform Act ("PLRA") to curb abusive lending practices from predatory payday lenders.

Despite the state's clear intention of rooting out abusive short-term, high-cost lending practices,

lenders found ways to circumvent the regulations with newly constructed forms of lending. As of

---

[1]Plaintiff files this motion before discovery to prevent Defendants from attempting to moot
Plaintiff's representative claims by tendering an offer for the full amount of their individual
damages while leaving the proposed Class without relief and subject to further and ongoing harm.
*See Joiner v. SVM Mgmt.*, 2020 IL 124671 (holding "that an effective tender made before a named
plaintiff purporting to represent a class files a class-certification motion satisfies the named
plaintiff's individual claim and moots her interest in the litigation.").

FILED DATE: 8/11/2025 4:26 PM    2025CH08291

December 2020, the average annual percentage rate ("APR") of a payday loan was 297%.

Recognizing the need for more robust consumer protection, Illinois passed the Predatory Loan Prevention Act ("PLPA") in March 2021. Despite the PLPA's strict protections against usurious loans (including its 36% interest rate cap), Defendants DailyPay, Inc. and DailyPay, LLC ("Defendants" or "DailyPay") have offered their short-term, high-cost cash advance product to Illinois consumers for years. In violation of Illinois law, DailyPay has used this product to extract from Illinois consumers charges that yield APRs drastically exceeding the legal limit.

DailyPay's product is merely the newest "shift[] and cunning device[] designed to evade the law." DailyPay's lending product—referred to herein as "Paycheck Advance"—is an "earned wage access" or "earned wage advance" ("EWA") service that was created and offered to consumers to avoid regulation applicable to lenders and loan products. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendants' Paycheck Advance transactions constitute loans.

DailyPay's regular business practices systematically violates the PLPA with respect to Plaintiff and each member of the putative class to whom DailyPay has extended its usurious loans. Plaintiff's claims should be certified on behalf of the class proposed below. Defendants acted uniformly toward the Class by charging every Class member over the 36% interest rate cap set by 815 ILCS 123/15-5-5; ¶ 2, 23. With such uniformity, certification is proper under Section 2-801.

Accordingly, Plaintiff seeks to certify the following Class:

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

All Illinois residents who entered into an agreement with DailyPay to use its earned wage advance (or substantially similar) product, in which DailyPay was paid a finance charge (including, without limitation, a transfer fee).

Compl. ¶ 102.

## FACTS

DailyPay is an app-based lender that makes cash advances to employees whose employers have partnered with DailyPay to facilitate Paycheck Advances. Generally, those employers pay employees hourly wages on fixed cycles (*i.e.*, every two weeks or monthly). DailyPay promotes their Paycheck Advances to those employees as providing them access to "wages" that employees have already "earned" during a pay cycle but have not yet receive. In order to enroll in the program, employees must authorize DailyPay to access their payroll data, which is then used to determine the amount of the Paycheck Advance available to the employee. Once enrolled, employees use a smartphone app-based platform to request funds via electronic transfer from DailyPay directly to their bank accounts.

For each Paycheck Advance, DailyPay charges fees that vary based upon the employer and the speed with which funds are made available. Specifically, DailyPay charges $0.00 to $1.99 for Paycheck Advances in which the borrower receives his cash disbursement within 1–3 business days depending on the employer. However, DailyPay charges up to $3.99 for Paycheck Advances in which the borrower receives cash disbursement immediately. For some employees, this means that a fee is mandatory regardless of whether the employee chooses a Paycheck Advance in which disbursement is immediate *or* occurs within 1–3 business days. These fees grossly exceed the actual expense to make real-time payments: the actual cost to provide customers with instant access to funds is less than $0.05.[2]

---

[2] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

DailyPay collects repayment of the Paycheck Advances it sends employees, along with all associated fees, by requiring employers to route employees' direct deposits to a bank account held by DailyPay. Only once DailyPay deducts everything it claims the employee owes them does DailyPay deposit any remaining amounts in employees' personal bank accounts.

Accordingly, DailyPay's product is designed to grow users' need for more loans: when a borrower obtains a Paycheck Advance, the amount that he receives from his next pay cycle is reduced by the amount of the Paycheck Advance, plus fees. As a result, employee borrowers are more likely to need to obtain another Paycheck Advance (and to pay another fee) in their next pay cycle to make up shortfalls that occur on payday. This creates a cycle of dependency in which the act of obtaining a Paycheck Advance creates a need, in the next pay cycle, for additional funds, thereby necessitating another Paycheck Advance. The result is an increasingly dependent user base, something DailyPay has acknowledged. In describing its annual revenue per-employee to investors, DailyPay notes that the average employee uses Paycheck Advances twice per week and generates $300.00 in revenue to DailyPay per year.

## ARGUMENT

Class certification is governed by Illinois Code of Civil Procedure Section 2-801. Under that rule, a certifying Court must find:

(1)     The class is so numerous that joinder of all members is impracticable.

(2)     There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3)     The representative parties will fairly and adequately protect the interest of the class.

---

https://www.theclearinghouse.org//media/new/tch/-documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

(4)     The class action is an appropriate method for the fair and efficient adjudication of the controversy.

735 ILCS 5/2-801. As detailed below, the proposed Class pass the test.

## A.     The Class is sufficiently numerous.

A class is "so numerous that joinder of all members is impracticable" if "such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991).

Here, Defendants extend usurious loans to Illinois residents throughout the state, entering into millions of credit transactions, placing thousands of Illinois residents in the Class as defined here. Compl. ¶ 102, 103, 105. Thus, the Court has "an ample basis" to find that "joinder of all members is impracticable." *Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (Ill. App. Ct. 1983); *Maxwell v. Arrow Fin. Servs.*, No. 03-cv-1995, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004) ("The court is permitted to make common sense assumptions that support a finding of numerosity.").

## B.     Common issues predominate.

Common questions must "predominate over any questions affecting only individual [class] members." 735 ILCS 5/2-801(2). Common questions exist when the members are aggrieved by similar misconduct. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 19 (Ill. 1981). They predominate when they "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (cleaned up).

The PLPA requires a 36% APR cap on loans extended to consumers in Illinois. 815 ILCS 123-15-1-15 & 123/15-5-5. Additionally, the PLPA requires calculation of the APR using the same

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

method required for calculation a military annual percentage rate under 30 C.F.R. § 232.4, meaning the interest includes ancillary fees and charges associated with the loan.

PLPA claims naturally raise common questions: Are Plaintiff and Class members subject to the protections and limitations of the PLPA? Is DailyPay a "lender" as that term is understood under the PLPA, 815 ILCS 123/15-1-10. Did DailyPay issue "loans" as that term is understood under the PLPA, 815 ILCS 123/15-1-10? Did DailyPay's loans to members of the Class exceed the 36% interest rate cap set by 815 ILCS 123/15-5-5? Are Class members entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts? Is DailyPay subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiff and the Class are entitled under 815 ILCS 505/10a? And is the Class entitled to any declaratory and/or injunctive relief?

Defendants' uniform conduct dictates common answers to those questions. Defendants extended loans to Plaintiff and each class member in the form of Paycheck Advance transactions. Compl. ¶ 95, 108, 111. Plaintiff obtained loans from DailyPay in the form of Payday Advance transactions, as did other Class members, *Id.*, so Defendants' failure to comply with the PLPA can be adjudicated once and for all. Common issues therefore predominate as required.

## C.     Plaintiff is an adequate representative.

To "ensure that the claims of the class representatives have the same essential characteristics as the claims of the class at large," *Van v. Ford Motor Co.*, 332 F.R.D. 249, 280 (ND Ill. 219), a class is permissible if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Additionally, to ensure "that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim," *Purcell and Wardrope*

6

FILED DATE: 8/11/2025 4:26 PM   2025CH08291

*Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069 1078 (Ill. Ct. App. 1988), a movant must show that they and their counsel "will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3).

Here, Plaintiff's claims have the same factual and legal bases as other Class members and Plaintiff entered into the same consumer credit transaction agreement with DailyPay as the Class members. Compl. ¶ 108. Consequently, Defendants' conduct has resulted in identical injuries to Plaintiff and Class members. *Id*. Thus, Plaintiff's claims are typical of the proposed Class. *Id*.

Plaintiff has retained counsel experienced in class actions. Compl. ¶ 123-124. Plaintiff and Plaintiff's counsel are committed to vigorously litigating this action on behalf of the Class and have the resources to do so. *Id*. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to the Class. *Id*. Plaintiff will therefore adequately represent the Class.

**D.      Class proceedings are appropriate.**

Finally, to show class proceedings appropriate for resolving the case, 735 ILCS 5/2-801(4), Plaintiff must show that a class action "(1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204.

Here, class litigation would serve the ends of efficiency and consistency of adjudication because class treatment of common questions conserves the Court's and Parties' resources. Compl. ¶ 111. Sealing the deal is the fact that the Class members' claims would be too expensive to bring individually, and Class members would be left with inadequate remedies. *Id*. Thus, the "class

action is the only practical means for class members to receive redress." *Gordon*, 224 Ill. App. 3d at 204 (quotation omitted).

<div align="center">

**CONCLUSION**

</div>

As detailed above, this case is appropriate for class certification. Discovery will prove as much. Accordingly, Plaintiff moves the Court to: (1) enter and reserve ruling on this motion; (2) allow for discovery on class-certification issues; (3) grant Plaintiff leave to file an amended supporting memorandum upon completion of class discovery; (4) certify the Class after full briefing; and (5) provide all other and further relief that is equitable and just.

Dated: August 11, 2025                                           Respectfully submitted,

                                                                 s/ Courtney Elizabeth Ross Brown
                                                                 One of Plaintiff's Attorneys

Courtney Elizabeth Ross Brown
CARNEY BATES & PULLIAM, PLLC
1 Allied Drive, Suite 1400
Little Rock, AR 72202
T: 501- 312-8500
F: 501-312-8505
cross@cbplaw.com
ARDC # 6340021

*Attorney for Plaintiff and the Class*

FILED DATE: 8/11/2025 4:26 PM  2025CH08291

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 10

FILED
8/20/2025 8:42 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH08291
Calendar, 10
34088297

FILED DATE: 8/20/2025 8:42 AM   2025CH08291

# AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

CIRCUIT COURT, MUNICIPAL DEPARTMENT-FIRST DISTRICT
STATE OF ILLINOIS, COUNTY OF COOK

Purchased/Filed:

Index #   2025CH08291

*James Higuera, individually and on behalf of all others similarly situated*                    Plaintiff

against

*DailyPay Inc and DailyPay LLC*                    Defendant

STATE OF NEW YORK
COUNTY OF ALBANY          SS.:

_____ James Perone _____, being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ August 14, 2025 _____, at _11:00 AM_, at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Summons, Class Action Demand for Jury Trial

on

_____ DailyPay Inc _____, the

Defendant in this action, by delivering to and leaving with _____ Rhonye Bowery _____,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of

the Secretary of State of the State of New York, 99 Washington Avenue, Albany, NY, _2_ true copies thereof and that

at the time of making such service, deponent paid said Secretary of State a fee _40_ dollars; That said service was

made pursuant to Section _306 Business Corporation Law_. Deponent further says that deponent knew the person

so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly

authorized to accept such service on behalf of said defendant

Description of the person served:   Approx. Age: _51 - 65 Yrs._   Approx. Wt: _Over 200_   Approx. Ht: _5' 4" - 5' 8"_

Color of skin: _Black_     Hair color: _Brown_   Sex: _Female_   Other: _____

Sworn to before me on this

_14th_ day of August 2025

SCOTT SCHUSTER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SC6308636
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES JULY 28, 2026

James Perone

**Attny's File No.**

Invoice•Work Order # S1929620

*Servico. Inc. P.O. Box 871. Albany. NY 12201*

FILED
8/20/2025 8:42 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH08291
Calendar, 10
34088297

## AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

CIRCUIT COURT, MUNICIPAL DEPARTMENT-FIRST DISTRICT
STATE OF ILLINOIS, COUNTY OF COOK

Purchased/Filed:

Index #   2025CH08291

---

*James Higuera, individually and on behalf of all others similarly situated*                    Plaintiff

against

*DailyPay Inc and DailyPay LLC*                    Defendant

---

STATE OF NEW YORK
COUNTY OF ALBANY                    SS.:

_____ James Perone _____ , being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ August 14, 2025 _____ , at _ 11:00 AM _ , at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Summons, Class Action Demand for Jury Trial

on

_____ DailyPay LLC _____ , the

Defendant in this action, by delivering to and leaving with _____ Rhonye Bowery _____ ,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of

the Secretary of State of the State of New York, 99 Washington Avenue, Albany, NY, 2 true copies thereof and that

at the time of making such service, deponent paid said Secretary of State a fee 40 dollars; That said service was

made pursuant to Section 303 Limited Liability Company Law . Deponent further says that deponent knew the

person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly

authorized to accept such service on behalf of said defendant

Description of the person served:   Approx. Age: 51 - 65 Yrs.   Approx. Wt: Over 200   Approx. Ht: 5' 4" - 5' 8"

Color of skin: Black   Hair color: Brown   Sex: Female   Other: _____

Sworn to before me on this

_ 14th _ day of August 2025

SCOTT SCHUSTER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SC6308636
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES JULY 28, 2026

_____ James Perone
**Attny's File No.**
Invoice•Work Order # S1929621

*SERVICO. INC. P.O. BOX 871. ALBANY. NY 12201*